OPINION. Black, Judge: The three petitioners have in common the fact that during the taxable year 1944, they were three of the many stockholders of Mokan corporation. The principal issue here relates to the distributions made by Mokan to its stockholders during the taxable year. Mokan distributed an aggregate of $878,584.80 in cash, and, in addition, rights entitling its stockholders to purchase Panhandle Eastern Pipe Line Company shares at $30 per share. Of the 163,710 shares offered to stockholders, Mokan sold through the exercise of rights a total of 151,958 shares. Respondent determined that 24.14 per cent of Mokan’s distributions to its stockholders was taxable-as dividends and this percentage was applied in determining the taxability of certain of the distributions received from Mokan by petitioners. According to respondent’s computations the total of Mokan’s distributions, including cash and the rights, amounted to $3,550,213.33, but only 24.14 per cent of this sum, or $856,880.94, constituted dividends. The distributions were only to this extent dividends because of the limitations imposed by the amount of Mokan’s statutory “earnings or profits” for the taxable year. Petitioners contend on several grounds that no part of Mokan’s distributions constitutes dividends taxable to them as stockholders. Petitioners’ contentions as summarized in their brief are as follows: Point I. The cash distributions received in 1944 by the petitioners as shareholders of Mohan were returns of capital either A. because Mokan had no earnings or profits available for the payment of dividends or B. because they were amounts distributed in partial liquidation of Mokan. Any excess of capital returned over taxable basis would be, of course, capital gain. Point II. No income resulted from the exercise of rights to purchase Panhandle Eastern stock; and income, if any, which resulted from the sale of such rights was capital gain. As we see it, four issues are presented by the pleadings for our decision. The first issue to be disposed of is an issue of fact, the other three issues are issues of law. Issue 1. One of the essential facts not stipulated to by the parties involves the question of what is the proper basis to be used by Mokan for the shares of Panhandle Eastern stock which it sold. The question of basis depends upon the identity of the 151,958 shares sold by Mokan. At the time of sale, Mokan owned a total of 581,638 shares of Panhandle Eastern stock which were acquired in five different blocks at various prices. The details are set forth in our Findings of Fact and need not be repeated here. Petitioners introduced proof sufficient to identify the shares of stock in question as a part of the block of 324,326 shares acquired in 1937 at a cost of $15,500,000, or $47.86 per share. The basis of the shares of Panhandle Eastern stock is to be computed accordingly. Issue 2. The principal issue here arises out of respondent’s determination that Mokan’s distributions during 1944 were taxable as “dividends” to its stockholders, taxable that is to the extent of 24.14 per cent of the amount received by the stockholders. The taxability of the distributions was so limited by respondent because according to his computations, only $856,880.94 in earnings or profits was available to Mokan for distribution as dividends. The balance of Mokan’s distributions during 1944 would necessarily be from its capital. Respondent contends specifically that the taxable portion of the distributions, i. e., the dividends, was from “(2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.” The words embodied in the quotation are taken from section 115 (a) of the Code which appears in the margin.[1] The distributions in question, depending upon their source, must be one or the other: (1) dividends distributed “out of its earnings or profits” within the meaning of section 115 (a) of the Code, or (2) distributions from capital within the meaning of section 115 (d) of the Code. As will be explained, the source of the distributions in question was necessarily from Mokan’s capital, therefore, the distributions fall within the purview of section 115 (d) of the Code, which reads as follows: (d) Otheb DISTRIBUTIONS from Capital. — If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend. It should be stated at the beginning of our discussion for the sake of clarity that the issue before us involves a distribution of capital made under section 115 (d) of the Code, and the distribution was not made in liquidation or in partial liquidation within th'& meaning of section 115 (c) and (i) of the Code. Section 115 (a) of the Code provides that the source of a corporate dividend distribution may be from certain of its accumulated earnings or profits, see subsection (1) of section 115 (a) of the Code, or it may be from out of its earnings or profits of the taxable year, see subsection (2) of section 115 (a) of the Code. The parties are in agreement that the source of Mokan’s distributions was not from its accumulated earning or profits for it is stipulated that it had a deficit of $2,184,094.12 in its accumulated earnings and profits at the beginning of the taxable year. If the distributions in question are dividends, then it must be because they were distributed from Mokan’s “earnings or profits of the taxable year.” The question before us then is to be answered by a consideration of the meaning of “earnings or profits of the taxable year.” Petitioners compute Mokan’s earnings to be one amount, respondent computes them to be another amount. Both computations are set forth in our Findings of Fact,[2] with petitioners computing for Mokan a deficit of $4,943,-535.08 for the taxable year and with respondent computing earnings and profits of $856,880.94 for the taxable year. Both computations accept net taxable income as the starting point in computing the amount of earnings or profits of the taxable year. The amount of taxable net income for 1944 is agreed upon as being $1,009,452.12. From the taxable net income of Mokan for the taxable year, in determining earnings or profits available for distribution as dividends in the taxable year, petitioners make four reductions, while respondent makes only three. Comparing the two computations, we find two principal differences: (1) Are Mokan’s earnings or profits of the taxable year to be reduced by $2,713,969.88 because of the sale to its stockholders of 151,958 shares of Panhandle Eastern stock, and (2) did Mokan sustain a loss or reduction in earnings in 1944 on the sale of its stock in Kentucky Natural Gas Corporation in the amount of $3,167,347 as petitioners contend-, or was the loss only $81,000 as respondent has determined? Of course, neither of these losses may be deducted in computing Mokan’s taxable net income for the year 1944; however, they may or may not be deductible from Mokan’s net income in computing the amount of 1944 earnings and profits available for dividends, as the case may be. It is the latter question which we have before ns for decision. Inasmuch as our decision on (1) above is decisive of the issue as to Mokan’s earnings and profits available for distribution as dividends in 1944, we find it unnecessary to decide as to petitioners’ contention that Mokan suffered a loss of $3,167,347 from the sale of its stock in Kentucky Natural Gas Corporation in 1944. We have, therefore, omitted from our Findings of Fact any of the stipulated facts as to the sale of this Kentucky Natural Gas Corporation stock. We need to consider here only the first of the two differences between the parties, namely, the one involving 151,958 shares of Panhandle Eastern stock. These shares were sold to Mokan stockholders pursuant to the Mokan Plan, that is, step one of the Mokan Plan. This plan consisting of a resolution adopted in 1944 by Mokan stockholders is set forth in our Findings of Fact. The plan is divisible into two distinct steps, each being severable and independent of the other. While the complete execution of the Mokan Plan will liquidate Mokan, it is the second step which would bring about the corporate liquidation. The carrying out of the first step obviously does not liquidate Mokan for Mokan remained a corporation in being after the first step was completed during 1944. The execution of step two does not automatically follow after execution of step one. As a matter of fact, the second step of the Mokan Plan has never been executed, except in part. So viewing the Mokan Plan, we see no merit in petitioners’ contention that the distributions in question were made in partial liquidation within the meaning of section 115 (c) and (i) of the Code. The essential facts relating to the Panhandle Eastern stock are these: Mokan stockholders of record on July 12, 1944, were given rights to buy at $30 per share, 163,710 shares of Panhandle Eastern stock owned by Mokan. The oifer to sell Panhandle Eastern stock at this price extended to November 1944. For every 10 shares of Mokan common, a Mokan stockholder was entitled to buy 1 share of Panhandle Eastern and for every 200 shares of Class B Mokan, a Mokan stockholder could purchase 1 Panhandle Eastern share. The fair market value of Panhandle Eastern stock on the date that the rights were issued was $40 per share. The required number of rights to purchase 1 share of Panhandle Eastern was worth $10 on July 12, 1944, or $1 per right. The total consideration received by Mokan from the sale of Panhandle Eastern shares to its stockholders was $4,558,740. Mokan computed the cost of the 151,958 shares to be $47.86 per share, or an aggregate cost or taxable basis of $7,272,-709.88. Petitioners contend that as a result of this transaction Mokan’s earnings or profits for 1944 are to be charged with a loss of $2,713,969.88 ($7,272,709.88 less $4,558.740). In addition to the sale of 151,958 shares to its stockholders, Mokan in August 1944, sold 6,000 shares of Panhandle Eastern on the open market for $46,125 per share. From this sale on the open market, Mokan realized a loss of $11,010 which is conceded by respondent as one to be deducted from net income in computing the earnings or profits of the taxable year. From the sale of the entire 157,958 shares of stock, Mokan realized a total of $4,835,490 which sum, together with other funds of Mokan, was used pursuant to the Mokan Plan to pay off an indebtedness of $5,050,000 incurred by Mokan in connection with the purchase of Panhandle Eastern stock. Mokan’s records indicate that in granting the rights to its stockholders it did not intend to declare a dividend, but even so the distribution may be a dividend if sufficient earnings or profits were available. It is apparent that Mokan made a bargain sale to its stockholders, and a bargain sale may.in effect be a distribution taxable as a dividend provided, of course, that the source be from earnings or profits. See V. U. Young, 5 T. C. 1251, supplemental opinion, 6 T. C. 357; J. E. Timberlake, 46 B. T. A. 1082, affd. (C. A. 4, 1942) 132 F. 2d 259. Petitioners contend that Mokan, for the purpose of computing its earnings or profits available for dividends, sustained a loss of $17.86 on each of the 151,958 shares of Panhandle Eastern sold based upon a cost price of $47.86 per share and sale price of $30 per share. The respondent, in computing 1944 earnings or profits of Mokan, would allow no loss for the Panhandle Eastern shares sold relying for his authority on First Savings Bank of Ogden v. Burnet, (C. A. D. C., 1931) 53 F. 2d 919. The court there held that in computing net income no deduction is to be allowed where a corporation distributes as a dividend to the shareholders another corporation’s shares of stock, the shares having at the time of distribution a market value of less than cost. The taxpayer, a corporation, claimed the deduction under section 23 (a) (4) of the Revenue Act of 1921, the Code equivalent of which is section 23 (f). A deduction under section 23 (f) of the Code is not claimed by petitioners; instead, the issue here relates to section 115 (a) of the Code and the amount of Mokan’s 1944 earnings or profits. Respondent’s authority is not in point. The treatment of distributions in kind of appreciated property has been parallel and consistent for the purpose of determining statutory earnings or profits and realization of taxable net income, Estate of Ida S. Godley, 19 T. C. 1082. This is not to say, however, that “taxable net income” and “earnings or profits of the taxable year” are synonomous; frequently they are not the same. The principal problem here, as we see it, is one of properly determining from the facts the nature of the Panhandle Eastern transaction. It is not always easy to determine whether a transaction with stockholders is to be categorized as a sale, or is to be categorized as a distribution of assets to the stockholders. See and compare the different holdings of the three courts in: (1) Bradley W. Palmer, 32 B. T. A. 550, (2) our decision being reversed on appeal, 88 F. 2d 559, and (3) the judgment of the court of appeals was reversed, Palmer v. Commissioner, 302 U. S. 63. It is our conclusion here, after considering the facts carefully, that the transaction involving the 151,958 shares of Panhandle Eastern stock was in part a sale by Mokan to its stockholders, and, at the same time, the transaction was in part a distribution. We think that the difference between the cost of $47.86 per share and the fair market value of $40 per share represents a transaction similar to a sale. To the extent of $7.86 per share of Panhandle Eastern sold by Mokan, a loss was realized. It would be unrealistic to contend that the $7.86 was distributed by Mokan to its stockholders. Based upon our holding in R. D. Merrill Co., 4 T. C. 955, we hold that this loss is to be deducted from Mokan’s 1944 net income in arriving at the amount of its earnings or profits available for distribution as dividends. The loss sustained by Mokan was actually only $7.86 per share and the reduction of Mokan’s net income for 1944, in determining its earnings or profits available for distribution, is necessarily limited to this amount. We have used as the valuation date the date on which Mokan issued the rights to purchase Panhandle Eastern shares. It is immaterial here that subsequently, during the period that the rights were being exercised, the market price of Panhandle Eastern shares steadily increased. Palmer v. Commissioner, supra, so holds. Of the total difference of $17.86 between cost and sale price of each share of stock, the remaining difference of $10 is made up of the difference between the fair market value ($40 per share) and the sale price ($30 per share). This $10 per share is nothing but a discount allowed by Mokan to its stockholders. We see no merit in petitioners’ contention that the loss realized by Mokan on the sale of Panhandle Eastern shares must also include the discount allowed by Mokan to Mokan stockholders. Mokan, in selling the shares at bargain prices to Mokan stockholders, was in effect making a distribution of corporate property tó Mokan stockholders. Since the discount was in effect a distribution by Mokan, it must be taken into account in computing for subsequent taxable years Mokan’s capital and its accumulated earnings or profits available for distribution as dividends. While the amount distributed via a bargain sale to stockholders will reduce the accumulated earnings or profits available in subsequent years for dividends, it is not to be deducted in computing current earnings or.profits. Section 115 (a) of the Code so provides: “the earnings or profits for the taxable year” are to be “computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year.” As already explained, we have before us a computation involving earnings or profits of the taxable year. In the instant proceeding the property distributed to the stockholders of Mokan had a fair market value less than cost, the same situation as was presented in R. D. Merrill Co., supra, see particularly page 961. We there held that in determining the effect of such a distribution upon earnings or profits, the accumulated earnings or profits should be charged with cost of the property. In Reynolds Spring Co. v. Commissioner, 181 F. 2d 638, the United States Court of Appeals, Sixth Circuit, cited with approval our decision in R. D. Merrill Co., supra, as follows: Petitioner properly charged the hoot value of the stock distributed to capital surplus in the sum of $2,412,875.83, and under § 718 (a) (2) this figure was used in computation of equity invested capital. The deduction of the sum of $742,830, being the fair market value of the shares at the time of distribution, fails to take into account the fact that the property distributed was a part of the corporate investment. The bearing of this consideration has been excellently stated in R. D. Merrill Co. v. Commissioner, 4 T. C. 955. While the question in that case was whether the corporate property distributed in kind, which had declined to a value below cost, should be charged against earnings and profits figured at cost, the rationale of decision was the same as in the instant case. The opinion states: “When property, as such, is distributed, it is no longer a part of the assets of the corporation, and the investment therein goes with it. That investment is the cost. An investment of corporate assets in property is not a mere book entry, as is indeed proven when it is distributed in kind. * * * When the res distributed leaves the corporation, that investment, i. e., that amount of corporate assets, also leaves, actually and physically; and nothing less than a charge of cost, i. e., the money originally converted to property, will represent the true financial situation. Though the distributee is taxed upon fair market value, that is because of section 115 (j) [26 U. S. C. A., §115 (3)]; and it is worthy of note that no statute sets a like rule for the corporation as to any profit to it when it distributes. Our conclusion is based upon mere realism: To charge earnings and profits with fair market value instead of a greater cost would create a booh situation altogether contrary to the facts.” We follow the principle of R. D. Merrill Co., supra, and here hob that the cost of the property distributed, that is, $17.86 per share oi Panhandle Eastern,[3] is to be charged directly or indirectly to the accumulated earnings or profits available for dividends as of the end of the taxable year. We recognize, of course, that the charge to the extent of $7.86 of the $17.86 is made directly to earnings or profits of the taxable year and thus indirectly to accumulated earnings or profits. The remaining $10 of the $17.86 would be charged, just as a dividend is, directly to accumulated earnings or profits. According to the respondent’s computation Mokan had earnings or profits available for distribution for the taxable year of $856,880.94, and this amount was arrived at without any reduction whatsoever for the loss on the Panhandle Eastern stock. We have concluded that Mokan sustained a loss of $1,194,389.88 based upon the sale of 151,958 shares of Panhandle Eastern stock at $30 per share, the $1,194,389.88 being arrived at in the manner heretofore explained ($7,272,709.88 cost, diminished by $4,558,740 cash received from sale, diminished further by $1,519,580 to be charged to distribution on account of fair market value of stock being $10 in excess of $30 received for it, equals $1,194,389.88). We hold that this latter amount of $1,194,389.88 is to be used in computing Mokan’s earnings or profits of the taxable year available for distribution as a taxable dividend. R. D. Merrill Co., supra. Therefore, the $1,194,389.88 loss must be deducted from the $856,880.44 earnings or profits otherwise available for distribution as eomputed'by the respondent, resulting in Mokan having no “earnings or profits” available for distribution as dividends. Consequently, we need not consider what was the correct basis to be used in computing the loss realized by Mokan on the sale of Kentucky Natural Gas Corporation stock. In view of what we have heretofore decided, the distributions made by Mokan during the taxable year are necessarily distributions of capital within the meaning of section 115 (d) of the Code. We, therefore, hold that the cash distributions received in 1944 by petitioners as stockholders of Mokan were returns of capital. This holding disposes of the second issue. Issue 3. Like Issue 2, we find that Issue 3 also relates to Mokan and the sale of its Panhandle Eastern shares. One of the petitioners, Marian L. Maguire, exercised her rights to acquire shares of Panhandle Eastern stock; the other petitioners sold their rights. The third issue is whether or not income resulted from the exercise of rights to purchase Panhandle Eastern stock. The respondent in the deficiency notice of petitioner Marian L. Maguire treated the difference between the price paid for the stock and its fair market value at the time of the exercise of the rights as a dividend to the extent of earnings and profits. His computation follows: Pair market value on 8/12/44 of 85.92 shares of Panhandle Eastern Pipe Line Co. stock at $48_$4,124.16 Subscription price of 85.92 shares at $30_:_ 2, 577.60 Difference -$1,546. 56 24.14% of the above difference taxable as dividend_ $373.34 The respondent’s determination is based upon the premise that Mo-kan had earnings or profits available for distribution as dividends. We have heretofore determined in Issue 2 that Mokan had no such earnings or profits. This being so, respondent erred in determining that the distribution was taxable to petitioner Marian L. Maguire as a dividend. This holding also disposes of adjustment (c) (1) made as to petitioner William G. Maguire and as to which the same issue exists. Issue 4. The fourth issue involves petitioner W. G. Maguire & Co., Inc., and petitioner William G. Maguire, who sold their rights to acquire Panhandle Eastern stock. As we have heretofore explained, the rights in question when exercised or sold constituted a distribution from capital within the meaning of section 115 (d) of the Code. On their respective tax returns petitioners reported gain from the sale of such rights as follows: [[Image here]] Respondent has determined that the entire proceeds from the sale of rights must be included in net income. He gave petitioners no cost basis for their rights sold and, in the deficiency notices he increased the net income reporled on petitioners’ returns by $63,603.55 and $33,166, respectively. Petitioners contend that the proper basis of each right was $1, the fair market value of the right at the time of issuance. On (heir tax returns petitioners used this basis and the proceeds from the sale of rights in excess of such basis were reported as short-term capital gain. It should be noted, however, that William G. Maguire did not sell all the rights he had received. He gave some of them to his wife and sold the balance, which was 62,46215/40 rights. Maui Test ly, in computing his gain from the sale, he is entitled to use the cost basis of only the 62,462i%0 rights which he sold and not the 63,6051 %o rights which he received. That adjustment should be made in a recomputation under Rule 50. Respondent has not. explained the theory upon which he made his determination. It ¡6 apparent, however, that the only theory consistent with his determination is that the proper basis for the rights is zero, rather than (he $1 used by petitioners in their returns. The petitioners in (heir brief state the law as they interpret it with reference to the sale of their rights, as follows: The treatment by the Commissioner of the proceeds from the sale of the rights as ordinary income taxable in its entirety without reference to the provisions of the Code relating to the taxation of shareholders as shareholders in anomalous. Any income' which a shareholder receives as a shareholder must be either a dividend or capital gain. Any distribution which a shareholder receives as a shareholder is either a return of capital (because the corporation is in liquidation or because the distribution contains no earnings), which may involve capital gain, or it is a share of the earnings of the corporation and taxable to the shareholder as a dividend. The quality which is peculiar to rights, but does not affect the foregoing conclusions, is that the mere receipt of the rights is not a taxable-event. Such an event occurs only upon the sale or exercise of the rights. If they are allowed to lapse then there is no tax consequence. We think the foregoing statement is a correct summary of the legal principles which must govern us in determining petitioners’ gain from the sale of their rights. Petitioners, of course, paid no money for their rights and, in that sense, had no cost basis for them. But on account .of the fact that Mokan was permitting its stockholders to purchase Panhandle Eastern stock for $30 per share, which had a fair market value of $40 per share at the time the rights were distributed, we have held that in instances where the rights were exercised or sold there was a distribution to the stockholders of $10 for each share of Panhandle Eastern stock sold for $30 per share. We further held that this distribution was not out of earnings or profits of Mokan because it had no earnings or profits to distribute and that under section 115 (d) of the Code the distribution was to be applied as a reduction of the cost basis of Mokan shares held by the stockholders. Applying this holding to petitioners, it means that the cost basis of their stock in Mokan will be reduced by $1 per right received by them and subsequently sold. The rights, which they each received and sold, resulted in a distribution of capital to each of them. To this extent their capital investment in Mokan shares was diminished and the rights thereby acquired a cost basis equal to such capital distributions. See section 115(d) of the Code already quoted elsewhere herein. We hold that petitioners have a cost basis of $1 per right and that cost basis should be used in computing their gain from the sale of their rights in 1944. The Commissioner erred in his determination that the entire amounts which petitioners received from the sale of their rights represented taxable income to them. Cf. Estate of Lauson Stone, 19 T. C. 872. In Docket No. 36033, W. G. Maguire & Co., Inc., the Commissioner determined a delinquency penalty of 25 per cent of the personal holding company surtax. Petitioner assigned no error contesting the imposition of this delinquency penalty. It is, therefore, sustained but will, of course, be recomputed along with the deficiency, if any, under Rule 50. Decisions will he entered under Rule 50. See in our Findings of Fact the table entitled; Statement of Mokan’s Earnings or Profits Available for Dividends — Tear 1944, We have found that Mokan’s cost basis per share of Panhandle Eastern was in fact $47.86. This cost must be reduced, of course, by the $30 per share received from those exercising rights to acquire the stock. Thus, we have a cost of $17.86 per share for the property distributed.